IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | No. 1:11-cr-222 (AJT) |
| Appellant, ) | - And Consolidated Cases - |
| ) | No. 1:11-cr-223 (AJT) |
| v. ) | No. 1:11-cr-224 (AJT) |
| ) | No. 1:11-cr-225 (AJT) |
| DONOVAN CRANK, *et al.* ) | No. 1:11-cr-226 (AJT) |
| ) | |
| Appellee. ) | |
| _____) | |

## **MEMORANDUM OPINION**

As matter of policy, memorialized in a Memorandum of Understanding between the Department of Justice and the Department of Defense ("MOU"), there has been an allocation of responsibility between military and civilian authorities with respect to the prosecution of crimes on military bases.[1] Under that policy, certain crimes committed on military installations, such as driving a motor vehicle while intoxicated (DWI), are to be resolved within the military justice system and not the civilian courts. All but, at most, two Marine Corps installations within the geographical area covered by the Fourth Circuit adhere to this policy with respect to on-base DWI offenses.[2] These consolidated cases involve one of those military installations, the Marine Corps Base at Quantico, Virginia ("Quantico"), which does not adhere to the general policy of a single prosecution, but rather has adopted a policy that, when possible, pursues DWI charges through both the military justice system and the civilian courts. Central to that policy of dual prosecution is a servicemember's waiver of his right to trial by court-martial in favor of non-

---

[1] Manual for Courts-Martial, United States, (2008 ed.), App. 3, at A3-4. ("MCM").

[2] *See* Doc. No. 10 at 7-10; Doc. No. 11 at 45-47.

1

judicial punishment, known within the military justice system as NJP. That waiver takes on critical importance because, absent that waiver, the Double Jeopardy Clause of the Fifth Amendment would permit a servicemember to be punished only in either the military justice system through a court-martial or a civilian federal court, but not both.

The defendants-appellees ("defendants") in these consolidated cases were at the time of their arrest members of the United States Marine Corps who were charged with DWI in both the military justice system through NJP and also in this Court after they waived their right to trial by court-martial. In response to the prosecutions in this Court, the defendants moved to dismiss the DWI charges on the grounds that they had not validly waived their right to a trial by court-martial and that by virtue of the punishment they had already received in the military justice system, albeit through NJP, the United States could not proceed with this prosecution. In response to defendants' motions to dismiss, the Magistrate Judge held evidentiary hearings with respect to the validity of defendants' waivers.[3] On April 25, 2011, the Magistrate Judge ruled that the defendants did not make voluntary, knowing, and intelligent waivers of their right to trial by court-martial and, absent such waivers, civilian prosecutions for the same crimes for which defendants had already been punished was inappropriate. On that basis, the Magistrate Judge dismissed the charges against the defendants. The government has appealed the Magistrate Judge's ruling.

These cases place in sharp focus what is required to obtain a valid waiver of a servicemember's right to trial by court-martial, which thereby permits both civilian and military

---

[3] The defendants-appellees were charged separately, but their cases were heard together for the purposes of the evidentiary hearings and have been consolidated for the purposes of this appeal.

2

charges that otherwise would be mutually exclusive. For the reasons stated herein, the Court affirms the Magistrate Judge's decision and dismissal of the pending charges.

## I. Standard of Review

The standard of review applicable for an appeal from a magistrate judge's decision is the same as that applicable to an appeal to the Court of Appeals from a judgment entered by a district court judge. Fed. R. Crim. P. 58(g)(2)(D). Thus, a magistrate judge's conclusions of law are reviewed *de novo* and findings of fact are reviewed for clear error. *United States v. Smith*, 395 F.3d 516, 519 (4th Cir. 2005). Because these appeals involve whether a waiver of the right to a court-martial is "voluntary, knowing, and intelligent," the Court reviews *de novo* the Magistrate Judge's dismissal of the charges at issue in these cases. *See United States v. Good*, 25 F.3d 218, 219 (4th Cir. 1994) (whether a waiver of rights is knowing, voluntary, and intelligent is reviewed *de novo* on appeal).

## II. Facts

These five defendants were separately arrested and charged with DWI on base at Quantico on various dates between May and July 2010. At the time each was arrested at Quantico, he was also given a date to appear in this Court on a DWI charge pursuant to Va. Code § 18.2-266, made applicable to his conduct at Quantico pursuant to the Assimilative Crimes Act, 18 U.S.C. § 13. *See generally United States v. Espinosa*, 789 F. Supp. 2d 681 (E.D. Va. 2011). Following their arrest, the defendants were taken before a superior officer and given the option of waiving their right to a trial by court-martial in favor of NJP. *Id.* at 685. They were also told the following with respect to their right to counsel:

> In order to help you to decide whether or not to demand trial by court-martial or to exercise any of the rights explained above [pertaining to non-judicial punishment] should you decide to accept non-judicial punishment, you may obtain the advice of a lawyer prior to any decision. If you wish to talk to a lawyer, a military lawyer will be

3

made available to you, either in person or by telephone, free of charge, or you may obtain advice from a civilian lawyer at your own expense.

See, e.g., Gov't Ex. 1, at 2. Based on this advice, the defendants were required to make an election among three choices. The first was to "talk with a military lawyer;" the second was to "talk with a civilian lawyer;" and the third was to "voluntarily, knowingly and intelligently give up my right to talk with a lawyer." Id. Three of the defendants, Gipson, Ware, and Espinosa, met with and spoke to a military lawyer offered to them. Espinosa, 789 F. Supp. 2d at 685. Defendants Crank and Bates waived their right to talk with a lawyer. Every defendant waived his right to a trial by court-martial, choosing instead to receive NJP in exchange for that waiver. Id. As a result of the NJP, the defendants received various combinations of punishment including a reduction in pay, a reduction in rank and grade, suspension of eligibility to be considered for promotion, confinement to quarters for 45 days, assignment of extra duties for 45 days and, in one case, administrative separation from the Marine Corps. Id. at n.5.

As the government conceded before the Magistrate Judge, the military authorities at Quantico have a policy of facilitating civil prosecutions in DWI cases after servicemembers select NJP. See Doc. No. 10 at 7-10; Doc. No. 11. at 47-52. Nevertheless, and as the government also concedes, the advice given to servicemembers in this context is limited. As a matter of military policy and practice at Quantico, the military lawyers offered to the defendants acted under instructions to avoid establishing an attorney-client relationship with them. Espinosa, 789 F. Supp. 2d at 688. For this reason, they limited their discussions to the technical aspects of a court-martial and NJP and the maximum penalties possible in a court-martial and in NJP; they did not discuss the specific facts or merits of each servicemember's case. Id.

With respect to the potential civilian prosecutions, the military officers advising these Marines explained that if the servicemember did not waive his right to a court-martial, the

4

Double Jeopardy Clause would bar a subsequent civilian prosecution for the same conduct; but if the servicemember elected NJP, then a subsequent civilian prosecution would be possible. *Id.* They also told them that they would have to appear in civilian court and that they could seek civilian counsel to assist them in understanding what might happen in civilian court. The civilian prosecution, however, was otherwise described as a matter separate and apart from the decision whether to waive court-martial and accept NJP. *Id.* These military lawyers intentionally did not discuss, and did not believe themselves competent to discuss, the possible or likely punishments, or even the maximum potential punishment, that the defendants could face in the civilian prosecution once they waived their right to a court-martial. *See* 1:10-mj-455, Doc. No. 16 at 128 ("Evidentiary Hearing."). Likewise, there was by intention no discussion concerning how possible or likely punishments in civilian court would compare with possible or likely punishments from a court-martial or NJP. *Id.* at 128-29. There was also no advice given as to what further administrative action the military might take if the civilian prosecution ended in a conviction. *Espinosa,* 789 F. Supp. 2d at 688. In short, the military lawyers focused on the structure of the military justice system, without discussing the individual merits of those charges or the possible consequences of a civilian prosecution. *Id.* at 689. As one of the military lawyers testified, "often times the Marine would say, 'what should I do?' Or 'tell me what to do.' And in those cases, I avoided saying 'this is what you should do.'" Evid. Hrg. at 112.[4] Rather, the military lawyers refer any discussion of potential penalties in the civilian prosecution to a defendant's civilian counsel to be obtained or appointed in the civilian prosecution after a court-martial waiver. *Espinosa,* 789 F. Supp. 2d at 688.

---

[4] One military lawyer testified that "as I always told them, I am not your attorney, I don't represent you, we're not establishing an attorney/client relationship, but what we talk about is confidential." Evid. Hrg. at 106.

## III. Discussion

### A. *Brady as Applied to Court-Martial Right.*

A servicemember has the right to demand a trial by court-martial for all offenses. 10 U.S.C. § 815(a). The Double Jeopardy Clause of the Fifth Amendment prohibits both a military court-martial and a civilian prosecution for the same offense; however, there is no constitutional bar to both NJP and a civilian prosecution for the same offense. *See United States v. Reveles*, 660 F.3d 1138, 1142 (9th Cir. 2011) (explaining that "nonjudicial punishment, unlike the general and special court-martial, is not a formal adversary criminal proceeding, but is regarded as noncriminal in nature" (quoting *Wales v. United States*, 14 Cl. Ct. 580, 587 (1980)); *see also Wade v. Hunter*, 336 U.S. 684, 687-89 (1949) (assuming that double jeopardy attaches to a court-martial); *Wilkes v. Dinsman*, 48 U.S. (7 How.) 89, 123, 12 L.Ed 918 (1849) (proceedings before a court-martial are "a bar to subsequent indictments in courts of common law for the same offence."). For these reasons, before a commanding officer can impose NJP, that officer must obtain a waiver of a servicemember's right to trial by court-martial. *United States v. Kelly*, 45 M.J. 259, 264 (C.A.A.F. 1996). Likewise, before a civilian prosecution can go forward, military authorities must decide whether to offer NJP[5] and the servicemember must decide whether to waive his right to a court-martial. *See* 10 U.S.C. § 815(b) ("any commanding officer *may* . . . impose . . . punishments for minor offenses without the intervention of a court-martial." (emphasis added))

---

[5] Article 15 of the Uniform Code of Military Justice permits a commanding officer to impose disciplinary punishment on a servicemember under that officer's command for "minor offenses." 10 U.S.C. § 815(b). The parties agree that the DWI offenses at issue in these cases are "minor offenses;" and the purpose of NJP is to permit a more efficient and prompt discipline for minor offenses, instead of using full court-martial. *See* S. REP. NO. 87-1911, at 1-3 (1960), *reprinted in* 1962 U.S.C.C.A.N. 2379, 2381-82.

The right to a court-martial is statutory, not constitutional. *Fairchild v. Lehman*, 814 F.2d 1555, 1559 (Fed. Cir. 1987); *United States v. Mack*, 9 M.J. 300, 320 (C.M.A. 1980). Nevertheless, the parties are in agreement that the requirements of *Brady v. United States*, 397 U.S. 742 (1970) pertaining to a waiver of a constitutional right apply to the defendants' waivers of their right to a court-martial; and the Court's analysis is based on that premise. *See* Gov't Br. 13-15 (discussing the limits of *Brady* and applying *Brady* to the waivers in this case); Gov't Reply 9 n.2 (explaining that military courts adopted *Brady* as the standard for validly waiving the statutory right to a court-martial). Independent of the parties' agreement, the Court concludes that the *Brady* standard is appropriate for evaluating the validity of the court-martial waivers under the circumstances of this case because they have the effect of avoiding the application of the Double Jeopardy Clause to the dual punishments that these defendants could not otherwise face.

Under *Brady*, a defendant's waiver must be "voluntary," "knowing," and "intelligent." *See Fairchild*, 814 F.2d at 1559 (the waivers "not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." (quoting *Brady*, 397 U.S. at 748)). The dispositive issue here is what is necessary under the facts of this case to obtain a "voluntary, knowing and intelligent" court-martial waiver in light of Quantico's policy of pursuing both civilian and military charges. Embedded in that waiver issue is whether defendants had a right to counsel in connection with their decision to waive a court-martial and, if so, whether they received counsel or validly waived any right to counsel.

For the purposes of satisfying the *Brady* standard, a defendant does not have to be informed of *all* possible consequences of a waiver. *Brady* only requires that a defendant be

informed of the "direct," but not the "collateral," consequences of a waiver. *United States v. Ayala*, 601 F.3d 256, 269 (4th Cir. 2010) (citing *Cuthrell v. Dir., Paxtuxent Inst.*, 475 F.2d 1364, 1365 (4th Cir. 1973). The distinction between a "direct" and "collateral" consequence "turns on whether the result represents a definite, immediate and largely automatic effect on the range of the defendant's punishment." *Cuthrell*, 475 F.2d at 1366. *Brady* also requires that an attorney assist the defendant in understanding the implications of those direct consequences. In short, a *Brady* waiver "cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts." *United States v. Smith*, 640 F.3d 580, 592 (4th Cir. 2011) (quoting *McCarthy v. United States*, 394 U.S. 459, 466 (1969)). As the Fourth Circuit observed within the context of a guilty plea, it is frequently impossible for a defendant to engage in "an intelligent assessment of the relative advantages" of waiving or not waiving his rights without the assistance of counsel, and where the *Brady* standard applies, as the government concedes it applies here, a waiver of rights without counsel or without a waiver of counsel is invalid. *Id.* (citing *Brady*, 397 U.S. at 748 n.6). For the above reasons, the Court concludes that in order for the defendants' court-martial waivers to be valid, these defendants were required to have counsel, or have validly waived counsel, who could advise them on the "direct consequences" of that court-martial waiver.

### B. *Direct v. Collateral Consequences of a Waiver.*

The parties disagree fundamentally over what is a "direct" versus a "collateral" consequence of defendants' waivers of their right to trial by court-martial. Briefly summarized, the government argues that the defendants can make a "knowing" and "intelligent" waiver without having any information about the civilian prosecution their waivers would facilitate because any civilian prosecution is "separate and apart" from any military prosecution. The

defendants argue that a civilian prosecution is a "direct" consequence of a court-martial waiver because the government may not punish a servicemember in both the military and civilian justice systems without the waiver; and by eliminating the Double Jeopardy Clause bar, the court-martial waiver permits an otherwise impermissible civilian prosecution. The defendants must therefore first know, with the assistance of counsel, the likely consequences of that civilian prosecution before a waiver can be "knowing" and "intelligent."

In this Circuit, what constitutes a direct consequence of a constitutionally required waiver has been construed narrowly. For example, in *Ayala*, the defendant entered a guilty plea without being told that his guilty plea could be used against him in a separate federal prosecution. *Ayala*, 601 F.3d at 269. The Fourth Circuit held that the possibility of defendant's plea being used against him in a later federal case was "plainly a collateral consequence" because "[i]n our system of dual sovereigns, state and federal courts run on separate tracks; thus, a guilty plea in one does not automatically lead to consequences in the other." *Id.* at 270. Unlike the waivers at issue here, defendant's guilty plea did not open the door for the federal prosecution.

In *Appleby v. Warden, N. Reg'l Jail and Corr. Facility*, 595 F.3d 532 (2010), the Fourth Circuit considered the direct-collateral consequence distinction within a sentencing context. There, the state court defendant pled guilty after the state court trial judge advised the defendant that the maximum punishment he could receive for his two DUIs was six years. *Id.* at 533-34. However, after the plea, in connection with the defendant's sentencing, the state sought a sentencing enhancement under the state's recidivist statute that had the effect of increasing the maximum period of incarceration from six years to a life imprisonment; the defendant was sentenced to life imprisonment with eligibility for parole after 15 years. *Id.* at 534. In a habeas petition, the defendant claimed that his plea was not "voluntary, knowing, and intelligent"

because he was unaware of the plea's real consequences. *Id.* The Fourth Circuit concluded that the recidivist enhancement was not a "direct" consequence of his guilty plea because the recidivist enhancement did not "automatically" follow from the guilty plea, but rather depended on prosecutorial decisions and proof separate and apart from defendant's guilty plea. *Id.* at 538, 541. Again, unlike the civilian prosecutions in this case that were made possible by the defendants' waivers, the government's ability to use the recidivist statute as a sentencing enhancement was not dependent on whether the defendant pled guilty; the government could have sought the recidivist enhancement in connection with any conviction, however obtained. *See also Meyer v. Branker*, 506 F.3d 358, 363-67 (4th Cir. 2007) (holding that defendant's lack of knowledge that his robbery conviction could be used as an aggravating factor in support of a death sentence did not undermine his guilty plea to murder because that fact was a collateral consequence).

Unlike *Ayala*, *Appleby*, and *Branker*, the challenged consequence in this case directly, immediately, and automatically resulted from the defendants' waivers. Specifically, the court-martial waivers were the *sine qua non* for the government's ability to proceed with a civilian prosecution for the same conduct; and while the government's decision to pursue prosecution in this Court may depend on certain other prosecutorial decisions (although the policy in place at Quantico appears to have already decided any such issues, making the civilian prosecutions "largely automatic"), with the Double Jeopardy Clause out of the way, no other decision or action was necessary to confer on the government the legal ability to proceed in this Court. For these reasons, the Court concludes that the elimination of the Double Jeopardy Bar, and the

possibility of these civilian prosecutions, were direct, not collateral, consequences of these defendants' waivers of their right to trial by court-martial.[6]

## C. *Knowledge of the Direct Consequences of a Waiver.*

Having found that the possibility of a civilian prosecution is a "direct" consequence of defendants' court-martial waiver, the Court must now determine whether the defendants had sufficient information about that possibility to make their waiver "voluntary, knowing, and intelligent." In making that determination, the Court must consider that the "law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply *in general* in the circumstances—even though the defendant may not know the *specific detailed* consequences of invoking it." *United States v. Ruiz*, 536 U.S. 622, 629 (2002) (emphasis in original). Here, the defendants were told that absent a waiver, both a civilian prosecution and a court-martial could not take place. The issue is whether that information was enough to obtain a valid court-martial waiver. Based on the facts and circumstances of this case, the Court concludes that because the military lawyers offered to the defendants could not counsel them, within an attorney-client relationship, about the range of relevant considerations concerning whether to waive a court-martial, their waiver was not "voluntary, intelligent and knowing" and therefore invalid.

The requirement under *Brady* that a waiver be voluntary, knowing, and intelligent is premised on a defendant having the benefit of legal counsel with respect to issues that need to be

---

[6] The government lists several scenarios which it contends illustrate the "absurdity" of finding that any consequence of the defendants' waivers is "direct" rather than "collateral." *See* Gov't Br. 1. None of those examples involves the situation presented in these cases: the government's ability to pursue its Quantico policy of dual prosecutions in both the military and civilian justice system depends on the defendants' decision concerning whether to waive a court-martial.

assessed and the decisions that need to be made. *See Smith*, 640 F.3d at 592; *Brady*, 397 U.S. at 748 n.6. None of the defendants were appointed counsel in connection with these charges within the military justice system. Rather, the military authorities told these defendants that they had a right to speak with a lawyer and that if they wanted to speak with a lawyer, a military lawyer would be available to them, free of charge.[7] Three of these defendants, Espinosa, Gipson, and Ware, met with military lawyers, only to learn that the military lawyers disclaimed any intention or ability to establish an attorney-client relationship and limited the nature and scope of the information and advice they would or could provide. Further, it is undisputed that the military lawyers made available to the defendants did not provide, and were under instructions not to provide, *any* advice as to the civilian prosecution other than the date of their appearance and the fact that a waiver of a court-martial would allow it to proceed.

Given the restricted scope of advice made available to these defendants, it is not surprising that there is nothing in the record that establishes that these defendants were even generally aware of the consequences of opening themselves up to a virtually certain civilian prosecution or that they "possess[ed] an understanding of the law in relation to the facts." *Smith*, 640 F.3d at 592 (quoting *McCarthy*, 394 U.S. at 466). For example, there is no evidence in the record that the defendants had even the most basic information about the maximum penalty they could receive in the civilian prosecution and how those penalties compared to what they would likely receive in either a court-martial or a NJP. In short, the defendants knew only that that they would have a civilian court date if they elected NJP. As a result, none of these defendants

---

[7] The defendants were also told that they could speak to privately retained counsel, at their own expense. The government does not argue, however, that the availability of this option cured any deficiencies that existed in connection with the defendants' use of military lawyers. Nor is there anything in the record to suggest that the government qualified, contrasted, or distinguished the nature of the legal advice obtainable through military lawyers as opposed to privately retained civilian lawyers.

received any meaningful assistance of counsel. In fact, for the purpose of determining whether each defendant had made a valid waiver, the Court concludes that these defendants effectively had no access to any lawyer. Without a lawyer that could, within a privileged setting, provide the relevant information, assessment, and advice pertaining to the direct consequences of their court-martial waivers, these defendants could not voluntarily, knowingly, and intelligently waive their right to trial by court-martial. *See Smith*, 640 F.3d at 592.

The Court also concludes that the other two defendants, Crank and Bates, who decided not to consult with the military lawyers offered to them, did not validly waive their right to counsel under the specific circumstances of this case. For the reasons discussed above, the government's offer to provide counsel was misleading, if not illusory. In fact, the entire procedure in place at Quantico for obtaining a court-martial waiver was premised on the view that these defendants did *not* have a right to a lawyer that could adequately advise them. As one of the military lawyers testified, the opportunity to consult with military lawyers was premised on the curious notion that the defendants had only the "right to *talk* to counsel before NJP," not the right "to *have* counsel." Evid. Hrg. at 125 (emphasis added). For that reason, the defendants who chose not to consult with a military lawyer simply passed on a nearly worthless opportunity. The Court cannot conclude that these defendants' waivers of counsel under these circumstances are valid. *See United States v. Johnson*, 659 F.2d 415, 416 (4th Cir. 1981) ("Courts entertain every reasonable presumption against the waiver [of counsel]"); *see also Fairchild*, 814 F.2d at 1560 ("We do not think that an accused can execute an intelligent waiver of his statutory right to trial when he has been misinformed of the consequences of electing nonjudicial punishment by counsel provided by the military."). For these reasons, the Court concludes that the court-martial

waivers of defendants Crank and Bates were also invalid because they had not validly waived counsel prior to waiving court-martial.

The United States argues that it would be burdensome and impractical to provide military lawyers who actually provide adequate legal advice under the circumstances of these cases. The Court finds nothing in this claim, even if true, that would justify eliminating the legal requirements for the waiver necessary to pursue these civilian prosecutions. This is particularly true given that these requirements are triggered solely by Quantico's discretionary dual prosecution policy that is not only not required under the MOU, but arguably inconsistent with it.[8]

Finally, the government contends that even if the court-martial waivers are not valid, the appropriate remedy is not the dismissal of these charges in this Court, but rather a remand back to the military justice system while these prosecutions proceed. Gov't Reply 19. When addressing constitutionally based violations, such as those presented here, the Court has broad equitable powers to dismiss charges if those violations prejudice a defendant. *See generally, United States v. Morrison*, 449 U.S. 361, 364-366 (1981); *United States v. Derrick*, 163 F.3d 799, 806-808 (4th Cir. 1998). Here, these defendants have already received their NJP and served those punishments, with some of those punishments effecting a fundamental change in status, including, in the case of one defendant, discharge from the Marine Corps. Cognizant that a

---

[8] In addition to the MOU, the Judge Advocate General Manual ("JAG Manual") illustrates the government's general policy of avoiding dual punishments for minor offenses, such as those brought against these defendants. For example, as stated in the JAG Manual, NJP "is designed for minor misconduct in a nonjudicial forum, without the permanent stigma of a 'Federal conviction.'" Manual of the Judge Advocate General § 0110(b). Moreover, if a servicemember has elected NJP, not only can he not be tried by court-martial for that same conduct, MCM, Part II, ¶ 907(b)(2)(D)(iv), he is not to receive even NJP if he has already been prosecuted in federal court for the same conduct. Manual of the Judge Advocate General § 0124(d).

remedy must be narrowly tailored to the injury suffered, *Morrison*, 499 U.S. at 364-65, the Court concludes that under the specific circumstances of these cases, the only adequate remedy is dismissal of the charges.[9]

## IV. Conclusion

For the above reasons, the Court affirms the order of the Magistrate Judge dismissing the charges against these defendants.

The Clerk is directed to forward a copy of this Memorandum Opinion to counsel of record.

The Court will issue an appropriate order.

Anthony J. Trenga
United States District Judge

Alexandria, Virginia
March 16, 2012

---

[9] The Court shares the government's view that this Court should not interject itself into the military justice system by altering the outcome of proceedings within that system. For that reason, this Court's vacating the NJPs based on the invalid waivers would inappropriately extend its reach into the military justice system, as well as possibly compound, rather than cure, the injuries these defendants sustained as result of the invalid waivers.

15